**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190622-U

Order filed March 13, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* ADOPTION OF S.S. | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| (Angela S. and Benjamin K., | ) | Peoria County, Illinois. |
| | ) | |
| Petitioners-Appellants, | ) | Appeal No. 3-19-0622 |
| | ) | Circuit No. 17-AD-87 |
| v. | ) | |
| | ) | |
| Barbara K.-K. and Michael S., | ) | The Honorable |
| | ) | Albert L. Purham Jr., |
| Respondents-Appellees). | ) | Judge, presiding. |

_____

JUSTICE CARTER delivered the judgment of the court.
Justices McDade and Wright concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  In an appeal in an adoption case, the Appellate Court ruled that the trial court's finding—that petitioners had failed to establish that respondent father was an unfit parent/person—was not against the manifest weight of the evidence.  The appellate court, therefore, affirmed the trial court's judgment, denying the petition for adoption.

¶ 2     Petitioners, Angela S. and Benjamin K., filed a petition in the trial court to adopt the minor child, S.S., the biological niece of Benjamin K., alleging, among other things, that respondent father, Michael S. (Michael), was an unfit parent/person because he had failed to

maintain a reasonable degree of interest in the minor. After an evidentiary hearing, the trial court found that petitioners had failed to establish by clear and convincing evidence that Michael was an unfit parent/person and denied the adoption petition. Petitioners appeal. We affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4        In May 2016, respondent mother, Barbara K.-K. (Barbara), gave birth to the minor, S.S. Two months later, in approximately July 2016, Barbara was arrested for selling heroin to an undercover police officer with the baby on her hip at the time. Upon her arrest, Barbara gave temporary guardianship of the minor to her mother, Michelle K. (Michelle). Two months after that, in approximately September 2016, when S.S. was four months old, Michelle had a stroke. Barbara's younger brother, Benjamin K. (Benjamin) and his long-term girlfriend, Angela S. (Angela), the petitioners in this case, agreed to take custody of S.S. From that time forward, S.S. lived with petitioners. Barbara was later sentenced to prison for her drug offense. In March 2017, Barbara executed a temporary guardianship form in prison to make Angela the temporary guardian of S.S. while Barbara served her sentence.

¶ 5        In June 2017, petitioners filed a petition in the trial court to adopt S.S. Barbara was served with a copy of the petition while in prison. Michael, who was also in prison at the time, was served with a copy of the petition as well because he was the presumed father of S.S. The service date on Michael was June 21, 2017. The petition alleged, among other things, that Barbara and Michael were unfit parents/persons as defined in the Adoption Act because they had failed to maintain a reasonable degree of interest in the minor (see 750 ILCS 50/1(D)(b) (West 2016)). Shortly after the adoption petition was served on Michael, Michael sent a *pro se* letter to the trial court stating that he was the presumed father of S.S.; that he was in prison; that he had

2

tried to file an acknowledgment of paternity, but the State declined his application because Barbara was married to another man at the time that S.S. was conceived and the other man did not sign the acknowledgment of paternity; that he wanted to exercise his paternal rights to the minor; and that he was asking that a paternity test be conducted. Michael attached to his letter and filed a petition for a writ of *habeas corpus ad testificandum* so that he could be brought to court to testify on the matter.

¶ 6 The following month, in July 2017, Michael filed a *pro se* motion in the trial court requesting to establish his paternity of the minor through deoxyribonucleic acid (DNA) testing and also requesting to be notified of any further court proceedings with regard to the parentage of the minor. Later that same month, the trial court entered an interim order. In the interim order, the trial court found, among other things, that Michael had made a claim to the Putative Father Registry to be listed as the putative father of S.S. The trial court granted petitioners temporary custody of the minor for the duration of the adoption proceedings, appointed a guardian *ad litem* (GAL) to investigate the case, and also appointed attorneys to represent Barbara and Michael. A few days later, Michael filed a *pro se* answer to the adoption petition. In his answer, Michael stated, among other things, that he was not present at the child's birth because he was in prison; that he was not consenting to the adoption; that he wished to assert his parental rights to the minor; that he was disputing the claim that he had failed to maintain a reasonable degree of interest in the minor; that he had a copy of the letter that he had sent to petitioners from prison, dated June 7, 2017, regarding the minor's welfare, to which petitioners never responded; that he also had a copy of the voluntary acknowledgment of paternity that he had filed, which was dated August 11, 2016; and that he had been in constant contact with "the mother."[1]

---

[1] It is unclear from the record whether Michael was stating in his answer that he had been in

3

¶ 7        In September 2017, Michael's appointed attorney entered an appearance in the case. Two months later, Michael's attorney filed a motion on Michael's behalf to conduct genetic testing to determine whether Michael was the biological father of S.S. The trial court granted the motion.

¶ 8        In March 2018, Barbara consented to the adoption of the minor by the petitioners and surrendered her parental rights to the minor for that purpose.[2] A few months later, in June 2018, the genetic test results were filed in the trial court. The test results established that Michael was the biological father of the minor. Several months later, in November 2018, the trial court entered an order requiring Michael to pay temporary child support to Angela (one of the petitioners) for the minor. The temporary child support payments were to begin the following month.

¶ 9        In May 2019, the trial court held a hearing on the petition for adoption. Michael was present in court for the hearing and was represented by his attorney. Much of what the evidence established at the hearing has already been set forth above. In addition to that information, the evidence presented at the hearing with regard to Michael's parental fitness/unfitness can be summarized as follows. Angela testified that petitioners took custody of S.S. in approximately September 2016. When the adoption petition was filed, petitioners lived in Peoria, Illinois, but they had since moved to Washington, Illinois, with the minor. According to Angela, as of the date of the hearing, Michael had never visited with the minor, had never tried to call or have Skype contact with the minor, and had never sent any birthday or holiday presents or cards to the minor. In Angela's opinion, Michael had not shown any interest in the minor, although Angela

constant contact with the child's mother, Barbara, or that he had been in constant contact with Barbara's mother, Michelle, who initially had guardianship of the minor.

[2] The surrender of parental rights that Barbara had executed was dated January 2018 but was not filed in the trial court until March 2018.

4

acknowledged that Michael had consistently paid child support for the minor from the time that the trial court had ordered Michael to do so. Angela testified further that Michael had contacted her one time (presumably, the letter), while he was still incarcerated, but she did not remember the date of that contact.

¶ 10　　Benjamin gave testimony that was similar to the testimony provided by Angela. In addition, Benjamin stated that he provided health insurance for S.S. through his job.

¶ 11　　Michael testified that he was arrested in November 2015 for felony driving while license revoked and that he was sentenced to prison for that offense in March 2016. Michael knew that Barbara was pregnant when he went to prison and later learned of S.S.'s birth through a letter from Barbara. Michael was still in prison at the time and had received the letter a few days or a week after S.S.'s birth. At some point later, while Michael was still in prison, he learned that Barbara had been arrested and that she had been sentenced to prison as well. Michael was incarcerated at the time, so there was not much he could do, as far as taking care of S.S. Michael contacted his brother and Barbara's mother, Michelle, and learned that Michelle was taking care of S.S.

¶ 12　　While Michael and Barbara were in prison, they were not allowed to communicate directly with each other, even by correspondence. As a result, they communicated by way of a third party, either through Michael's brother or Barbara's mother, Michelle. Michael and Barbara would send letters to those third parties and the third parties would relay the information to the other person.

¶ 13　　During his prison sentence, Michael had learned from a letter that he had received that Michelle had suffered a stroke, that she could no longer take care of S.S., and that temporary guardianship of S.S. had been signed over to petitioners. Michael had no problem with

5

petitioners taking care of S.S. while he was in prison but was not happy that petitioners were trying to adopt S.S. After Michael had been served with the adoption petition, he tried to put his name on the putative father registry from prison, but there was some problem with his request, and his request was sent back to him. Michael believed that his attorney had since corrected that problem.

¶ 14　　Michael was released from prison in November 2018. He did not have a driver's license at the time of his release or at the time of the hearing on the petition for adoption. Michael initially lived in LaSalle, Illinois, upon his release from prison but later moved to Peru, Illinois. At some point after Michael was released from prison, he began working as a supervisor for his prior employer, a packaging company. As of the hearing date, Michael was still employed by that company, was paid $17 per hour plus overtime, and was working from 5 a.m. to 8 p.m. during the week and on weekends.

¶ 15　　In about December 2018, Barbara got out of prison and moved in with Michael. Michael and Barbara had one other child together, a son, who was born in January 2015 with drugs in his system. That was when Michael found out that Barbara was using drugs. As of the hearing date, Michael had visitation with his son every other weekend.

¶ 16　　As far as his attempts to contact the minor or the petitioners, Michael testified that while he was in prison, he sent Angela one letter, along with a birthday card for S.S. In the letter, Michael thanked Angela for taking care of S.S. Michael purchased the birthday card in the prison commissary. The birthday card was for S.S.'s first birthday (May 2017). Michael received no response from petitioners to his letter. Michael had not sent any other birthday or holiday cards to the minor and had not paid any other child support for the minor, other than what had previously been described. In April 2019, Michael had tried to call Angela (to return a

6

phone call that he had received from Angela) but received no response. Michael stated that he had no address for petitioners since they had moved from Peoria to Washington, although Michael acknowledged that petitioners would frequently send text messages to Barbara. According to Michael, he had always inquired about S.S., usually through third parties, but petitioners did not contact him back and did not give him their address. In court at the hearing on the adoption petition was first time that Michael had ever seen S.S. and was the first time that Michael had personally attended a court date in this case. Michael testified further that he still wanted to be S.S.'s father and to be actively part of S.S.'s life, the same as he wanted to be actively part of his son's life.

¶ 17    Barbara testified that she was sentenced to five years in prison for delivery of a controlled substance. With good time credit, she served a little over an actual two years.

¶ 18    In addition to the testimony presented, the trial court also had before it at the time of the hearing the report of the GAL. In her report, the GAL described the background of this case, listing several of the facts set forth above. The GAL stated that she had asked Michael (through his attorney) to provide her with proof of his allegedly numerous attempts to contact the petitioners or the minor but that Michael had failed to provide her with any such proof. The GAL also discussed Michael's criminal history and opined that Michael met the definition of depraved under the Adoption Act (see 750 ILCS 50/1-D(i) (West 2016)). The GAL ultimately concluded that Michael had failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare and recommended that Michael's parental rights be terminated.

¶ 19    At the conclusion of the evidence, the parties and the GAL made their closing arguments. Because the proceedings potentially involved both a question of parental unfitness and a question

7

of the bests interests of the minor, all of the arguments, to some extent, touched upon respondent's efforts after he was served with the adoption petition and after he was released from prison. After the parties and the GAL had finished making their closing arguments, the trial court took its decision in the case under advisement.

¶ 20 At a court date later that month, the trial court announced its decision. The trial court found that petitioners had failed to establish by clear and convincing evidence that Michael was an unfit parent/person (that petitioners had failed to show by clear and convincing evidence that Michael had failed to maintain a reasonable degree of interest, concern, or responsibility as to S.S.'s welfare) and denied the petition for adoption.[3] In making its ruling, the trial court recognized that the relevant time period to be considered in this case was from the minor's birth until Michael was served with the adoption petition. See *In re Adoption of Syck*, 138 Ill. 2d 255, 271 (1990) (recognizing in that case that the relevant time period to be considered was from when the respondent gave up custody of the minor until the petition for adoption was filed). The trial court focused upon, among other things, the young age of the child; the short duration of the time period involved (13 months from the birth of S.S. to the service of the adoption petition); the fact that Michael was in prison during that time period, had no income, and had restrictions imposed upon his ability communicate with others (that he could not Skype); and the efforts that Michael had made to show interest, concern, or responsibility for the minor, despite his prison setting. The trial court noted that during the relevant 13-month period, Michael had sent a letter to the petitioners and a possibly a card to the minor and had inquired about the minor to third parties, although there was not much specific testimony presented about those inquiries. As the

_____

[3] The trial court also found that petitioners had failed to prove by clear and convincing evidence that Michael was depraved in that the presumption of depravity had been rebutted. It does not appear from the record, however, that depravity was ever alleged in the adoption petition as a basis for Michael's parental unfitness, although the GAL mentioned depravity in her report and the parties presented evidence on, and argued, depravity at the hearing on the petition.

8

parties and the GAL did in their closing arguments, the trial court also commented upon some of the efforts that Michael had made after he had been served with the adoption petition and after he was released from prison. The trial court repeatedly returned, however, to referring to Michael's efforts during the relevant 13-month period.

¶ 21    Petitioners filed a motion to reconsider. In the motion, petitioners alleged, among other things, that in making its determination on parental fitness/unfitness, the trial court might have improperly considered the efforts that Michael had made after he was served with the adoption petition (the petitioners noted in their motion that the trial court commented upon those efforts and argued that "[i]f" the court considered those efforts, it was improper). After a hearing was held, the trial court denied petitioners' motion to reconsider. In doing so, the trial court reiterated the reasons for its prior decision. The trial again referred to the relevant 13-month period and again pointed to the child's young age and Michael's circumstances—that Michael was in prison, that he had little to no money, that he could not communicate with the minor by Skype, and that he could not ask for visitation with the minor because his paternity had not been established and his request to be added to the putative father registry had been denied. The trial court noted that it had essentially made a credibility determination in Michael's favor and had concluded that while Michael was in prison, he had sent a letter to the petitioners and a birthday card to the minor and had inquired about the minor through "back channels." The trial court also commented that it thought the petition for adoption was filed prematurely in this case. Petitioners appealed.

¶ 22                                II. ANALYSIS

¶ 23    On appeal, petitioners argue that the trial court erred in finding that petitioners had failed to prove by clear and convincing evidence that Michael was an unfit parent/person. Petitioners

9

assert that the trial court's finding in that regard was against the manifest weight of the evidence, which, according to petitioners, showed that over a 13-month period before the petition for adoption was filed, the only interest that Michael had shown in the minor was to send one letter to petitioners. In making that assertion, petitioners emphasize that the first time that Michael saw the minor was at the hearing on the adoption petition. Petitioners assert further that in making its ruling, the trial court incorrectly considered the efforts that Michael had made after he had been served with the adoption petition. For all of the reasons stated, petitioners ask that we reverse the trial court's judgment, that we find that Michael was an unfit parent/person, and that we remand this case for the trial court to conduct a best interest hearing.

¶ 24         Michael argues that the trial court's ruling was proper and should be upheld. In support of that argument, Michael asserts that there was sufficient evidence presented at the hearing on the adoption petition to show that he had consistently expressed interest, concern, and responsibility for the minor's welfare. Most notably, Michael contends, the evidence showed that even though he was in prison when he learned of the child's birth and of the filing of the adoption petition, he made efforts to participate in the adoption proceedings by filing *pro se* pleadings in the trial court and by registering with (or attempting to register with) the putative father database. Furthermore, Michael asserts, once he was released form prison and resumed gainful employment and his paternity was established, he showed interest in the minor by paying significant child support, by offering to pay for the minor's health insurance if the petitioners were unable to do so, and by trying to keep advised of the minor's welfare by making third-party inquiries with some of the people around the minor. For all of the reasons set forth, Michael asks that we affirm the trial court's judgment.

¶ 25    Before a minor may be adopted, the minor's natural parents or guardian must consent to the adoption or the trial court must find that the natural parents are unfit and involuntarily terminate the natural parents' parental rights. See 750 ILCS 50/8 (West 2016); *Syck*, 138 Ill. 2d at 259. As to Michael in the present case, the petitioners sought to have the trial court terminate his parental rights involuntarily. The involuntary termination of parental rights in a child-adoption proceeding is a two-stage process in the trial court. See *Syck*, 138 Ill. 2d at 275-78 (indicating that in a proceeding under the Adoption Act, the trial court does not consider the best interests of the child until after, and only if, the trial court finds by clear and convincing evidence that the parent is unfit). In the first stage of the proceedings—the stage at which the trial court made its decision in the present case—the petitioner must prove the alleged ground of parental unfitness by clear and convincing evidence. *In re Adoption of L.T.M.*, 214 Ill. 2d 60, 67-68 (2005); *Syck*, 138 Ill. 2d at 274. A trial court's finding of parental unfitness is given great deference and will not be reversed on appeal unless it is against the manifest weight of the evidence; that is, unless it is clearly apparent from the record that the trial court should have reached the opposite conclusion or that the conclusion itself is unreasonable, arbitrary, or not based on the evidence presented. *L.T.M.*, 214 Ill. 2d at 68; *Syck*, 138 Ill. 2d at 274; *In re C.N.*, 196 Ill. 2d 181, 208 (2001); *In re A.M.*, 358 Ill. App. 3d 247, 252-53 (2005); *In re Tiffany M.*, 353 Ill. App. 3d 883, 890 (2004).

¶ 26    Under the Adoption Act, one of the grounds upon which a parent may be found to be an unfit parent/person is if he or she fails to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare. 750 ILCS 50/1(D)(b) (West 2016). In making such a determination, the trial court must examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred. *Syck*, 138 Ill. 2d at 276, 278.

11

Circumstances that should be considered include a parent's failure to personally visit the child and a parent's failure to otherwise attempt to communicate with the child. See *id.* at 278-80. If physical contact and personal visits are impractical, letters, telephone calls, and gifts may demonstrate a reasonable degree of concern, interest or responsibility. *Id.* at 279. The focus is on the parent's efforts to communicate with and show interest in the child, not upon the success of those efforts, and the issue to be decided is whether the parent maintained concern, interest, and responsibility as to his or her child's welfare that, under the circumstances, was of a reasonable degree. *L.T.M.*, 214 Ill. 2d at 68; *Syck*, 138 Ill. 2d at 279-80. Each case concerning parental unfitness is unique unto itself and must be judged based upon its own unique facts. See *Syck*, 138 Ill. 2d at 279. There is no temporal limitation when considering parental unfitness under this provision. See 750 ILCS 50/1(D)(b) (West 2016); *In re M.J.*, 314 Ill. App. 3d 649, 656 (2000).

¶ 27   After having reviewed the record in the present case, we find that the trial court's determination—that petitioners had failed to prove by clear and convincing evidence that Michael was an unfit parent/person—was well supported by the evidence presented. It is clear from the record in this case that in deciding whether Michael had shown a reasonable degree of interest, concern, or responsibility for the minor's welfare, the trial court properly considered the appropriate time period involved and all of the relevant circumstances. As the trial court noted in the instant case, the evidence presented at the hearing on the adoption petition showed that S.S. (the child to be adopted) was of a very young age at the time the adoption petition had been filed and served; that the time period involved was a relatively short period of 13 months; that Michael had been in prison during that entire time period; that Michael had no income and was faced with constraints on his ability to communicate because of his prison setting and because

12

paternity had not yet been established; and that despite his prison setting, Michael had sent a letter to the petitioners along with a birthday card for the minor's first birthday and had tried to stay informed about the minor's welfare through third-party inquiries. In light of that evidence, we cannot state that the trial court's ruling was unreasonable, arbitrary, or not based on the evidence presented or that it is clearly apparent from the record before us that the trial court should have reached the opposite conclusion. We find, therefore, that the trial court's ruling was not against the manifest weight of the evidence and must be affirmed. See *L.T.M.*, 214 Ill. 2d at 68; *Syck*, 138 Ill. 2d at 274; *C.N.*, 196 Ill. 2d at 208; *A.M.*, 358 Ill. App. 3d at 252-53; *Tiffany M.*, 353 Ill. App. 3d at 890.

¶ 28       In reaching that conclusion, we note that although the trial court commented upon some of the efforts that Michael had made after he was served with the adoption petition and after he was released from prison, it is clear from the record before us that the trial court was well-aware of the relevant 13-month period in this case and that the trial court's ruling was based upon Michael's efforts during that period. All of the parties and the GAL in this case also commented upon the efforts that Michael had made after the 13-month period had ended because the hearing in this case also potentially involved a question of best interests of the child, a question that the trial court would have reached if it had determined that parental unfitness had been proven.

¶ 29                                    III. CONCLUSION

¶ 30       For the foregoing reasons, we affirm the judgment of the circuit court of Peoria County.

¶ 31       Affirmed.